Via: First Class US Mail

Kent Douglas
Inmate Register Number 06479-087
Federal Correctional Institution
Fort Dix
P.O. Box 2000
Joint Base MDL, NJ 08640

January 22, 2022

Honorable Beryl A. Howell
Chief United States District Judge
The U.S. District Court for the District of Columbia
333 Constitution Avenue N.W.
Washington D.C. 20001

        Re: *Request for Reconsideration of Denial of Compassionate Release*
        Subject: **United States v. Kent Douglas**
        Case Number: **1:13-cr-011-BAH-001**

Dear Judge Howell:

    I am writing to request that you reconsider the previous denials of his Motions for Compassionate Release. The situation at FCI Fort Dix is dire and only getting worse. Now, Omicron has infected the prison and the facility is scrambling to try to contain it. I understand that your primary concern is his criminal history and risk of recidivism. I would like to point out that I had been engaged in recidivism reduction programming but, because of COVID, everything has stalled. I can longer walk without the use of a cane or other support device and I can no longer pray in the position required for Muslims because of significant arthritis and other problems with his legs. If nothing else, his own body will serve as a preventer of future criminal activity. I cannot do anything more than to keep telling you that I have learned many lessons. Age is probably been a friend in that understanding. I can seriously promise that the Court will never see me for felonious activity ever again. I am sure I would succeed on supervise release. I understand that his previous convictions tell a categorically different story and if I could take it all back I would. I can't. I ask that you please consider me as the changed person I am today including his age and his willingness to succeed. In addition to that, I respectfully request that you consider all of the following.

## The Pandemic

    We remain in the clutches of a global pandemic caused by a novel coronavirus. *See Thomas R. Frieden, former Dir. of the CDC, The Atlantic, COVID-19 Is Out Of Control. What Can We Do About It?* (Nov. 13, 2020)("The coronavirus is growing out of control. Deaths will likely increase to 2,000 people a day before the end of the year, and the virus will be with us for much of 2021 and possibly much longer.")(emphasis added),

https://www.theatlantic.com/ideas/archive/2020/11/covid-19-is-out-of-control-what-can-we-do/617097/. *See Audrey Carlsen, et al., NPR, "How is the COVID-19 Vaccination Campaign Going in Your State?"* (updated Nov. 1, 2021), https://www.npr.org/sections/health-shots/2021/01/28/960901166/how-is-the-covid-19-vaccination-campaign-going-in-your-state/. "Researchers have estimated that around 70%-85% of the country needs to be immune to the coronavirus for COVID-19 to stop spreading through communities and peter out." *Id.* "[T]here is widespread consensus among scientists and public health experts that the herd immunity threshold is not attainable -- at least not in the foreseeable future, and perhaps not ever. Instead, they are coming to the conclusion that rather than making a long-promised exit, the virus will most likely become a manageable threat that will continue to circulate in the United States for years to come." *Apoorva Mandavilli, NY Times, "Reaching 'Heard Immunity' Is Unlikely in the U.S., Experts Now Believe," May 3, 2021, updated May 11, 2021*, https://www.nytimes.com/2021/05/03/health/covid-herd-immunity-vaccine.html.

> While many of those infected by SARS-Cov-2 - the coronavirus that causes COVID-19 - are asymptomatic, a large portion of those that develop COVID-19 likely will suffer life-long damage to their internal organs.
>
> Recent clinical evidence indicates that in persons who suffer severe symptoms, the virus may also cause damage to organs such as the heart, the liver, and the kidneys, as well as to organ systems such as the blood and immune systems. **This damage is so extensive and severe that it may be enduring.** Among other things, patients who suffer severe symptoms from COVID-19 end up having damage to the walls and air sacs of their lungs, leaving debris in the lungs and causing the walls of lung capillaries to thicken so that they are less able to transfer oxygen going forward. Indeed, studies of some recovered patients in China and Hong Kong indicate declined lung function of 20% to 30% after recovery.

*Ruderman v. Kolitwenzew*, No. 20-cv-208, 2020 U.S. Dist. LEXIS 83163, *5-6 (C.D. Ill. May 12, 2020)(emphasis added; citations omitted); *Kathryn Krawczyk, The Week, "Even Mild Coronavirus Cases Can Cause Lasting Cardiovascular Damage, Study Shows"* (July 28, 2020)(reporting on "a recent study of 100 recovered patients reveals 78 of them now have lasting cardiovascular damage even though a vast majority of them had mild cases of COVID-19 in the first place")(emphasis added), https://theweek.com/speedreads/927908/even-mild-coronavirus-cases-cause-lasting-cardiovascular-damage-study-shows. In fact, "[t]ens of thousands of people in the United States have lingering illness following COVID-19. In the US, we call them post-COVID 'long haulers.' ... Published studies ... and surveys conducted by patient groups indicate that 50% to 80% of patients continue to have bothersome symptoms three months after the onset of COVID-19 -- even after tests no longer detect virus in their body." *Anthony L. Komaroff, M.D., Ed. in Chief, "The Tragedy of Long COVID," Harvard Health Letter* (Mar. 1, 2021), https://www.health.harvard.edu/blog/the-tragedy-of-the-post-covid-long-haulers-2020101521479.

While the virus has spread quickly within the United States, it is estimated to spread nearly four-times faster within prisons. *See Lisa B. Puglisi, M.D., et al., "Estimation of COVID-19 Basic Reproduction Ration in a Large Urban Jail in the United States,"* 53 Ann. Epidemol. 103-105 (Jan. 2021)(estimating basic reproduction rate ("R0" which is pronounced R-Naught) at 8.44 within jails and prisons), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC7480336/ ; *Joe Hilton, et al.,*



*"Estimation of country-level basic reproductive ratios for novel Coronavirus (SARS-CoV-2/COVID-19) using synthetic contact matrices,"* 16(7) PLoS Comput. Biol. (July 2020)(estimating U.S. R0 at 2.22 to 2.47), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC7363110/.

According to the New York Times, "in federal facilities, at least 39 percent of prisoners are known to have been infected. The true count is most likely higher because of the dearth of testing, but the findings align with reports from The Marshall Project and Associated Press, U.C.L.A. Law and the COVID Prison Project that track COVID-19 in prisons. The virus has caused misery and loss in may places, but its destructive power has been felt intensely among the incarcerated, who have been infected at several times high than those of their surrounding communities." *Eddie Burkhalter, et al., "Incarcerated and Infected: How the Virus Tore Through the U.S. Prison System"* (Apr. 10, 2021), https://www.nytimes.com/interactive/2021/04/10/us/covid-prison-outbreak.html.

Recently, a federal correctional institution (FCI Texarkana) was the site of a notable outbreak when the Delta Variant infiltrated that facility despite widespread vaccination. This outbreak was so alarming that the CDC sent a special team to investigate. "During July 2021, a COVID-19 outbreak involving the Delta variant was identified in a federal prison in Texas, infecting 172 of 233 (74%) incarcerated persons in two housing units. The Federal Bureau of Prisons (BOP) partnered with CDC to investigate." *Liesl M. Hagan, MPH, et al., "Outbreak of SARS-CoV-2 B.1.617.2 (Delta) Variant Infections Among Incarcerated Persons in a Federal Prison – Texas,"* (July-August 2021), CDC MMWR, September 24, 2021 / 70(38);1349-1354 at https://www.cdc.gov/mmwr/volumes/70/wr/mm7038e3.htm. The team observed "the potential for SARS-CoV-2 Delta variant outbreaks in congregate settings including correctional and detention facilities, even among resident populations with high vaccination coverage." *Id.* (emphasis added). Indeed, the CDC found that there were a "high number of infections in vaccinated person" despite the high level of vaccination. *Id.*

The fact that vaccination did not prevent infection "underscore[d] the importance of implementing and maintaining multiple COVID-19 prevention strategies in settings where physical distancing is challenging, even when vaccination coverage is high." Id. What was quite troubling was the team's finding that despite the high vaccination rates among inmates, the same was not the case with staff: "BOP records indicate that nearly two thirds of staff members in this prison were unvaccinated, and at least nine were infected during this outbreak. In addition, during the 2 weeks before the outbreak, community transmission was high." Id. (emphasis added). This is extremely problematic since, obviously, "SARS-CoV-2 can be introduced into correctional facility populations and back into the community through daily entry and exit of staff members and interfacility transfers of incarcerated persons. ... [T]he identification of a single viral lineage among all sequenced specimens in this outbreak suggests a single introduction of the virus into the prison. Bidirectional connections between correctional facilities and communities highlight the importance of high vaccination coverage among both staff members and incarcerated persons." *Id.* (footnotes omitted).

In this regard, it is particularly concerning that the efficacy of the vaccines now appear to be waning far more quickly than initially hoped for. Current estimates are that the vaccines wane

significantly in their efficacy shortly after their second dose as it is unclear the extent of vaccine efficacy after six months. *See Hiam Chemaitelly, M.Sc., et. al. Waning of BNT162b2 Vaccine Protection against SARS-CoV-2 Infection in Qatar, New Eng. J. of Med.*, Oct. 6, 2021 ("Waning of vaccine protection against severe acute respiratory syndrome coronavirus 2 (SARS-CoV-2) infection or coronavirus disease 2012 (Covid-19) is a concern. The persistence of BNT162b2 (Pfizer-BioNTech) vaccine effectiveness against infection and disease in Qatar, where the B.1.351 (or beta) and B.1.617.2 (or delta) variants have dominated incidence and polymerase-chain-reaction testing is done on a mass scale, is unclear."), https://www.nejm.org/doi/full/10.1056/NEJMoa2114114. Booster shots are now highly recommended for those whom received the Pfizer or Moderna vaccines, including prison inmates. *See CDC, Media Statement, CDC Expands Eligibility for COVID-19 Booster Shots* (Oct. 21, 2021)(recommending booster shots for anyone "18+ who work or live in high risk settings," which includes "correctional facilities"), https://www.cdc.gov/media/releases/2021/p1021-covid-booster.html.

In fact, the COVID-19 pandemic is apparently the deadliest event in the BOP's history. The figure below compares the number of deaths from various causes over an 18-year period to the number of deaths caused by COVID-19 since March 2020 when COVID-19 was first detected inside BOP institutions. As of November 21, 2021, COVID-19 has killed at least 266 inmates (plus an additional 18 in private contract



Inmate Causes of Death: COVID-19 Compared to Select Causes

facilities) and seven staff. COVID-19 has killed more inmates in less than two years than AIDS did in an eighteen-year period. Or, put another way, COVID-19 has killed more inmates per year than any other cause of death to inmates including homicide, suicide, AIDS, and accidents.

It is disconcerting that the Bureau of Prisons has lost more inmates per year over the last two years than in any single year over the previous eighteen. But, it is no surprise given the prison system generally lacks adequate healthcare delivery systems for inmates, is unable to employ appropriate mitigation strategies, does not properly study the efficacy of whatever mitigation strategies that are employed, and inmates have been forced into more of a sedentary life than anyone in the country.

Nor is the pandemic giving any sign that it is nearing an end. In the past several months, a new strain of COVID-19 has rocketed around the globe and has even infiltrated the BOP. *See Hagan, et al., supra*. Known as the "Delta Variant," it is considered "super-contagious" and "is prompting new lockdowns around the world and spurring new warnings from public health officials." *Emily Anthes, "The Delta Variant: What Scientists Know," NY Times* (updated Jun. 30, 2021), https://www.nytimes.com/2021/06/22/health/delta-variant-covid.html. It has grown from just 1.3% of cases in May to over 51.7% currently. *See id.; Emily Anthes, "Delta, As Expected, is Now the Dominant Virus Variant in the U.S., the C.D.C. Estimates,"* NY Times (Jul. 7, 2021), https://www.nytimes.com/2021/07/07/health/delta-variant-cdc.html.

The Delta Variant is so contagious that it "may be able to partially evade the antibodies made by the body after a coronavirus infection or vaccination. And the variant may also render certain monoclonal antibody treatments less effective, the C.D.C. notes." *Id.* "Studies suggest ... that a single shot of a two-dose regimen provides only weak protection against Delta." *Anthes, "Delta, As Expected...," supra.* More alarming is that "Delta may also cause more severe illness. A recent Scottish study, for instance, found that people infected by the Delta variant were roughly twice as likely to be hospitalized as those infected with Alpha [the original strain]." *Id.; Kathrine Lang, MedicalNewsToday, "Delta variant has 235% higher risk of ICU admission than original virus,"* (Oct. 8, 2021), https://www.medicalnewstoday.com/articles/delta-variant-has-235-percent-higher-risk-of-icu-admission-than-original-virus.

Unsurprisingly, the virus has mutated yet again. It is even more virulent and even more contagious than it's predecessor.

The Omicron Variant is a new and "ominous" variant of SARS-CoV-2. The World Health Organization and the CDC have listed it as a Variant of Concern. In the words of Poland's Health Minister, Omicron is a "game changer." First detected in South Africa toward the end of November, it has quickly been identified around the world including in more than 20 states within the United States.

Initial reports are that the Omicron Variant spreads at least twice as quickly as the Delta Variant, the previous variant of concern, which quickly became the predominant variant within the United States. "New data from South Africa and Europe hint that Omicron cases are poised to explode in the U.S., where the vast majority of the population isn't well protected against infection." In fact, "[t]op federal health officials warned in a [recent] briefing . . . that the omicron

5

variant is rapidly spreading in the United States and could peak in a massive wave of infections as soon as January [2022]."

The Omicron Variant also is thought to increase the chances of reinfection by over three times. What is currently unknown is whether the Omicron Variant is even more virulent. However, if hospitalizations rates out of South Africa are any indication, it is.

In addition to apparently being more transmissible and virulent, there also are indications that the Omicron Variant may largely evade immunity brought by a previous infection. Moreover, "[t]he omicron variant . . . will probably evade – or at least severely diminish – many forms of the main tool physicians have [to fight its infection], known as monoclonal antibodies, according to recent laboratory studies." Likewise, vaccines will struggle to protect against this variant. This is so because of the sheer number of mutations on the virus. Whereas Delta had 10 or 12 mutations, Omicron is thought to have more than 50. At least three shots are now required to provide sufficient immunity. According to a recent study out of Israel, even with a booster shot, such will only provide "about four times lower" efficacy against Omicron "than the neutralization ability against Delta. . . . [W]e [also] don't know if this will decrease with time and we're working on that." At least one widely available vaccine—Johnson & Johnson—provides no protection against Omicron.

Unfortunately, the BOP simply does not have nearly enough supply to vaccinate the remaining unvaccinated inmates and also provide booster shots to the remaining population. As the graph below illustrates, the BOP is estimated to have on hand enough doses to vaccinate 38,633 inmates with two doses each (orange line). While that is sufficient to vaccinate the remaining 20,651 unvaccinated inmates (blue line), that would only leave enough doses to provide a single-dose booster to another 35,963 inmates (yellow line). That would still leave nearly 100,000 inmates insufficiently vaccinated with a full three doses.



This is especially problematic given the BOP's exceedingly slow pace at administering vaccines to inmates. The BOP did not even have enough doses to vaccinate the remaining unvaccinated inmates until mid-October 2021, and since then the BOP has barely made a dent. This is especially problematic because the efficacy of prior vaccinations is now known to be wearing off. Hence, again, the need for boosters. As the BOP notes in its COVID-19 Vaccine Guidance, "[i]nmates who are not moderately to severely immunocompromised and who received the Pfizer-BioNTech COVID-19 vaccine as their primary 2-dose vaccination series should be offered a booster dose at least 6 months after the second dose." The BOP, in short, is simply incapable of fully vaccinating enough inmates quickly enough to adequately protect inmates, staff, and surrounding communities from the ravages of COVID-19.

The speed of mutation leads to a troubling conclusion beyond the obvious ones of health and safety. Conditions of confinement inside the Bureau of Prisons will likely remain far more restrictive than years past. Or, in the words of Chief Judge Gregory from the Fourth Circuit Court of Appeals, "[a] day in prison under current conditions is a qualitatively different type of punishment than one day in prison used to be. In these times, drastically different." *United States v. Kibble*, 992 F.3d 326, 335 (4th Cir. 2021)(Gregory, C.J. concurring).

### The Pandemic's Physical Effect on Douglas

Douglas was infected with COVID-19. He has taken the vaccine. But the number of inmates and staff refusing the vaccine is staggering. It's honestly no surprise since FCI Fort Dix, and apparently the BOP as a whole, has made ***no attempt to provide education about the risks, benefits, and expectations for the vaccine.*** Instead, the prison puts up posters that assert the vaccine is effective and safe, but provides zero patient specific information. Thus, Douglas was placed in danger in the most elementary way. Inmates that live within several feet of Douglas refuse to get the vaccine because they are not given appropriate education about the risks, benefits and efficacy (in layman terms) of the vaccine. All the BOP needed to do was provide proper education, training, financial support and develop reasoned policies. The BOP obviously failed in this regard.

More importantly, Douglas contracted COVID-19 as a direct result of all of the mismanagement. And, without several full medical workups, that the BOP simply won't provide, it is unknown how much damage Douglas's body suffered because of COVID-19. To be sure, the BOP will undoubtedly assert that Douglas's medical record makes no indication of "long haul" symptoms. But it can't be disputed that the BOP is ***not*** conducting any studies to determine if inmates have lingering symptoms by using pulmonary function tests, radiographic imaging, or other medically accepted tools to determine if there are underlying medical conditions exacerbated by COVID. Thus, any claim by the BOP that Douglas did not suffer significant long term damage would be mere conjecture. Because it is likely that Douglas has suffered significant cardiac and pulmonary damage from COVID-19, as studies show is highly likely, Douglas respectfully requests the Court reduce his sentence.

### *Conditions Of Confinement*

#### Introduction

Douglas is presently being held at the Federal Correctional Institution at Fort Dix in the District of New Jersey. Before the pandemic, Douglas participated in beneficial programming including a the Residential Drug Abuse Program. But the pandemic put a stop to programming and the conditions that resulted consists of extremely limited outdoor access, suspension of virtually all inmate programs, suspension of visitation, and isolation to a single floor for over two months with over 100 inmates when they all (Douglas included) contracted COVID-19. And while Douglas has made due, the conditions created by the pandemic are unduly harsh and have obliterated any reliance the Court had on the Bureau of Prisons' ability to provide correctional and rehabilitative treatment in an effective manner.

It cannot be understated just how restrictive the Bureau of Prisons has become as a result of the COVID-19 pandemic. There is no doubt that the BOP needed to employ strategies in order to protect inmates, staff and the community. The problem is the conditions became overly harsh and more punitive than could have ever been envisioned by the Court at the time of sentencing while also failing to mitigate the rates of infection among the inmate population. The BOP's response to the pandemic has been, and remains, unreasonable. The BOP's unreasonableness has resulted in lower overall life-expectancy of the inmate population as a whole and has created unreasonable hardships thus making the time being served substantially more punitive than for inmates of years past. Conditions at FCI Fort Dix are especially horrible. Inmates are confined to the housing unit, only given up to three hours per week for outdoor exercise, not provided with proper cleaning equipment, prohibited from visiting with their support systems, and prevented from accessing the rehabilitative and correctional programming the Court envisioned during sentencing. Probably the most difficult part of the pandemic has been that inmates have not been able to receive visits from those that continue to support them.

It is quite difficult to maintain positive relationships while inside a prison environment on a good day. Yet, it is absolutely imperative to do just that if there is any hope for success upon release. Indeed, the Bureau of Prisons has always touted that maintaining community ties is especially important for successful reentry. Inmates without sufficient community or family ties are actually found to be more of a security risk than those with community ties. *See Bureau of Prisons Program Statement 5100.08, Chapter 5.C.6 ("Family and Community Ties")*. Ostensibly because of the pandemic inmates are restricted in trying to maintain complex interpersonal relationships only through 15-minute phone calls, limited "e-mail" access and letters through the mail. To be sure, Congress ordered the BOP to provide free minutes to inmates to contact family and friends during the pandemic. And while inmates are appreciative of the gesture, when looking around at all the staff that come and go without any masks or vaccines, inmates are left to wonder why they can't have a proper visit with their families that have been vaccinated or produce a negative test. The econohis has reopened and society is trying to learn to live with COVID-19, which will likely remain endemic to American society, but the BOP still remains on strict lockdown.

FCI Fort Dix has reported that visiting is "reopened." However, "reopened" is a stretch because inmates are permitted to schedule a one-hour visit on a a single day of the month for up to two people (children included). The visitor and inmate must remain in masks, separated by a hideous shower curtain, and remain at least 10 feet apart at all times. The restrictions are so onerous that inmates are discouraged from asking their families to come and visit. As the Court is

8

certainly aware, those restrictions are just to great for someone to travel many hours for a single hour contactless visit. That leaves the phone. Anyone who believes that complex interpersonal relationships can endure for decades through 15-minute phone calls is encouraged to pick up a phone, call a loved one and then have someone hang up the phone at exactly 15-minutes. Then, wait an hour before placing another call - no matter how important the conversation was. Moreover, inmates are restricted to 500 minutes per month. Once an inmate reaches the 500-minute maximum, the phone turns off and will not reactivate until the month resets.

Visiting provides the needed bridge to maintain those connections that are so vital for successful reentry. When inmates have the ability to visit, even once per year, they are able to solidify relationships. Then, using the limited phone and email systems help maintain those solid connections. But without visitation, inmates are left in despair and their families have no recourse.

Inept prison management has also been a cause for concern among every inmate in the BOP because that mismanagement is resulting in deaths. To be sure, FCI Fort Dix is home of the deadliest decision in domestic politics. Someone, somewhere, but we are all left to guess who, made the decision to transfer hundreds of inmates from a COVID-19 hotspot (FCI Elkton, Ohio) to FCI Fort Dix which had zero infections. Allegedly, the inmates left FCI Elkton without COVID-19 and somehow became positive en route. Shortly after the transfer was completed, Douglas



contracted COVID-19 along with nearly every single inmate in the prison. It went through like a wildfire. During the period of infection, the mismanagement continued. Inmates were confined to a single floor and forced into closer proximity with each other. Medical staff would come to the unit and take temperatures, not log them, and then inform inmates to just stick it out. Douglas was

9

not given any medication to help with the pain of coughing, sore throat, or joint pain. Inmates weren't taken to the hospital because there was no mechanism in place to determine if an inmate needed to go to the hospital. Sure, Douglas survived the infection but at what cost? Were he able to access proper treatment, he would have not had to suffer such unreasonable hardships. Were the prison system properly managed, Douglas probably wouldn't have contracted COVID-19 at all since the introduction of the virus to FCI Fort Dix was the result of mismanagement. Finally, sedentary living, which prisoners are forced to endure at FCI Fort Dix, is well known to lead to an early grave.[1]

Before the pandemic, FCI Fort Dix inmates were able to access a gymnasium, health-education, educational opportunities, and exercise opportunities. To top it off, the pandemic *obliterated* the Bureau of Prisons' programs and forced the administration to restrict inmate movement significantly. The restrictions were put in place in an obvious effort to curb the spread of COVID-19. It didn't work. But, because the BOP felt FCI Fort Dix didn't need any financial backing to prevent the spread of COVID-19[2], Douglas and the majority of his living unit contracted COVID-19 despite all of the restrictions. No matter, the Bureau of Prisons has remained steadfast in restricting inmate movement. F.C.I. Fort Dix is still operating under this most restrictive "modified operations" available, Level 3 or "Red." This basically means inmates are locked down in their housing units 24/7 and prevented from actually programming.



Very recently, a district court in the Middle District of North Carolina granted

---

[1] Q&A with Erin Donnelly Michos, M.D., M.H.S. of Johns Hopkins University, https://www.hopkinsmedicine.org/health/wellness-and-prevention/sitting-disease-how-a-sedentary-lifestyle-affects-heart-health, ("large review of studies published in 2015 in the Annals of Internal Medicine found that even after adjusting for physical activity, sitting for long periods was associated with worse health outcomes including heart disease, Type 2 diabetes and cancer. Sedentary behavior can also increase your risk of dying, either from heart disease or other medical problems."); *see also* Charansonney, Oliver L., *"Physical activity and aging: A Life Long Story,"* (Discovery Medicine, Sept. 11, 2011), https://www.discoverymedicine.com/Olivier-L-Charansonney/2011/09/09/physical-activity-and-aging-a-life-long-story/.

[2] Woolsten, George, *"NJ Lawmakers Question BOP about lack of FCI Fort Dix funding,"* Burlington County Times (March 3, 2021)(quoting letter from Sens. Mendez and Booker to Director Carvajal which stated in relevant part, "Unfortunately, it is clear that FCI Fort Dix did have serious unmet needs related to COVID-19 prevention and mitigation, and that the facility has been unable to safely manage its operations...."), https://www.burlingtoncountytimes.com/story/news/2021/03/03/nj-lawmakers-question-bop-lack-fci-fort-dix-funding/6907115002/.

sentence reductions to several inmates because of FCI Fort Dix administration's ineptitude in managing the pandemic. *United States v. Newell*, 2021 U.S. Dist. LEXIS 143059, 1:13-CR-165-1 (M.D.N.C. Jul. 30, 2021). As is made clear in myriad cases, FCI Fort Dix inmates have complained since day one that the facility is not actually implementing its policies to prevent COVID. Rather than enforce rational rules, such as ensuring soap dispensers always have anti-viral soap, the administration has concerned itself with attempting to limit inmate congregation in confined areas. Notwithstanding that simply allowing inmates to access the outdoors would be the most effective in that regard, staff have been rude and unprofessional towards inmates in demanding they wear masks at all times (even though they must sleep and bathe within close proximity of each other), distance chairs in already overcrowded television rooms. The only time the policies are followed is when an inspection is announced from the Regional Office. Inmates are then forced to get everything in order for the benefit of the inspectors. Immediately after the inspectors leave, everything reverts back to the way it was before the inspectors came. It also appears that the administration believes that COVID-19 will spontaneously appear inside the prison. Invariably, the officers that rudely and unprofessionally demand mask wearing and social distancing compliance are the same officers that have obstinately refused to wear masks themselves even though they are the only ones that walk on both sides of the fence (i.e. where COVID-19 is and where COVID-19 is not). Had the Bureau of Prisons, especially the administration at FCI Fort Dix, simply followed the guidelines issued by nearly every federal agency on the matter, the likelihood of outbreak at FCI Fort Dix would have been negligible. But such is life and the inept management at FCI Fort Dix caused Douglas to not only be exposed to COVID-19 **but to also contract the virus.**

Time served under extraordinarily harsh conditions takes its toll. Prisoners have certainly done something worthy of societal isolation. But when that isolation turns into unreasonable hardships, prisoners should be awarded some credit for suffering through those hardships. This is especially true when, like here, the prisoner has maintained relatively good conduct and continued to better themselves despite all of the restrictions. With the passage of the First Step Act's amendments to the compassionate release statute, the Court is fully empowered to grant additional credit for time served under harsh conditions. Accordingly, Douglas respectfully requests the Court grant him a sentence reduction on this basis as well.

## Conclusion

At this point, Douglas has served more than two-thirds of his sentence and has proven himself to be a safe individual. He had enrolled in RDAP but the program had ceased conducting the therapy that Douglas so desperately needs. COVID should not stand in the way of progress. Granting him a reduction in sentence will allow him to access correctional programming in the most effective way.

The dangers at FCI Fort Dix are only getting more serious. Douglas would like to be able to spend a little of his final years on this planet with whatever family he has left. His biggest support system, his brothers, are both now quite I'll and it is unknown how much longer they will be here either. At this point, having a support system in place is far better than allowing those support

11

systems to literally die off before they can provide the support a released prisoner desperately needs. Accordingly, I respectfully request that the Court reconsider it's previous denial and award a reduction in sentence pursuant to 18 USC 3582(c)(1)(A) for extraordinary and compelling reasons.

Humbly,

*[signature]*

Kent Douglas[\*]

I certify that I caused a copy of the foregoing letter to be mailed on or about January 22, 2022 to the following:

James Stephen Sweeney, AUSA
U.S. ATTORNEY'S OFFICE
Special Proceedings Section
Judiciary Center Building
555 Fourth Street, NW
Washington, DC 20530

Honorable Beryl A. Howell
Chief United States District Judge
The U.S. District Court for the District of Columbia
333 Constitution Avenue N.W.
Washington D.C. 20001

*[signature]*

Kent Douglas

---

[\*] Douglas is utilizing a service to assist him with preparing *pro se* motions. He should not be presumed to have any training or education in law or legal analysis. If there are any questions, please email inmateservices@protonmail.com. Because of the pandemic we are working remotely and only work through email.